UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ONPATH FEDERAL CREDIT UNION                    CIVIL ACTION

VERSUS                                                              NO. 20-1367

UNITED STATES DEPARTMENT OF              SECTION "R" (2)
TREASURY, COMMUNITY
DEVELOPMENT FINANCIAL
INSTITUTIONS FUND

## ORDER AND REASONS

Before the Court are cross-motions for summary judgment by defendant the United States Department of Treasury, Community Development Financial Institutions Fund ("the CDFI Fund"),[1] and plaintiff OnPath Federal Credit Union ("OnPath").[2]  Each party opposes the other's motion.[3]

Because the CDFI Fund's repayment demand was not arbitrary and capricious, the Court grants defendant's motion, and denies plaintiff's motion.

---

[1]     R. Doc. 19.
[2]     R. Doc. 52.
[3]     R. Docs. 34 & 56.

## I.    BACKGROUND

This case involves a demand by the Treasury Department that OnPath Federal Credit Union repay approximately twelve million dollars in awards that it received from the Treasury's CDFI Program for fiscal years ("FYs") 2006 through 2009, 2011, and 2012.  The facts in the case are essentially undisputed.

The Treasury Department's CDFI Fund supports financial institutions that serve low-income and historically underserved individuals and communities.[4]  Institutions seeking support from the CDFI Fund must apply for and receive CDFI certification in order to become eligible to apply for awards.  12 C.F.R. § 1805.200(a)(2).  To become certified as a CDFI, an institution must, among other regulatory criteria, serve a "Target Market." *Id.* § 1805.201(b)(3).  An applicant may show that it serves a Target Market by demonstrating in its application that it provides financial products or services to at least one (a) "Investment Area," or (b) "Targeted Population." *Id.* § 1805.201(b)(3)(i).

An "Investment Area" is a geographic unit that either (a) meets certain regulatory criteria for economic distress, and "has significant unmet needs" for financial products and services; or (b) encompasses or is wholly located

---

[4]     R. Doc. 19-4 at 144 (OIG Audit Report).

within an Empowerment Zone or Enterprise Community designated in the Internal Revenue Code. *See id.* § 1805.201(b)(3)(ii). A "Targeted Population" includes individuals who are low-income or lack adequate access to financial products and services. *See id.* § 1805.201(b)(3)(iii). The CDFI Fund's certification application divides Targeted Populations into Low-Income Targeted Populations ("LITPs") and Other Targeted Populations ("OTPs"). LITPs consist of individuals whose family income is not more than: for metropolitan areas, 80% of the area median family income; or, for non-metropolitan areas, the greater of 80% of the area median family income or 80% of the statewide non-metropolitan area median family income.[5] OTPs consist of individuals in certain racial and ethnic groups, as well as other demographically defined groups, if such individuals have unmet needs for financial products and services.[6]

The CDFI Fund's certification application indicates that, to meet the Target Market criterion, an applicant must show that it directs at least 60% or more of its activities to a Target Market, defined with reference to either Investment Areas or Targeted Populations.[7] The applicant must also explain

---

[5]   *Id.* at 19 (OnPath's Application for CDFI Certification).
[6]   *Id.* at 21.
[7]   *Id.* at 20-22.

3

the methodology it used to calculate this percentage.[8]  To determine whether the Target Market requirement is satisfied, the CDFI Fund relies on the data and methodology provided by the applicant.[9]  The application states that, if an applicant does not meet the 60% threshold, then it has "not . . . demonstrated that it meets the Target Market Requirement[,] and will not be certified" as a CDFI.[10]

In the fall of 2005, OnPath, a federal credit union based in Louisiana,[11] began the application process for CDFI certification.[12]  Early correspondence from OnPath to the CDFI Fund indicates that OnPath set out to meet the Target Market requirement by using Investment Areas, but had technical difficulties.  Specifically, OnPath wrote to the CDFI Fund that it had imported over 80,000 of its members' addresses to the CDFI Fund's system,

---

[8]      *Id.* at 145 (OIG Audit Report).

[9]      *Id.*

[10]     *Id.* at 21 (OnPath's Application for CDFI Certification).

[11]     Documents and communications from this period refer to OnPath as ASI Federal Credit Union ("ASI").  ASI changed its name to OnPath in 2019. *See* Press Release, ASI Federal Credit Union rebrands as OnPath Federal Credit Union (Nov. 22, 2019), https://www.cuinsight.com/press-release/asi-federal-credit-union-rebrands-as-%EF%BB%BFonpath-federal-credit-union.  For consistency's sake, this Order and Reasons refers to plaintiff as "OnPath," and, as needed, alters using brackets any quoted material containing "ASI."

[12]     R. Doc. 34-4 at 1 (Email from Sarah Taylor to CDFI Fund) (Oct. 20, 2005).

but that, when it attempted to "geocode the addresses," it received "error messages stating that the format [was] invalid."[13]  OnPath ultimately decided not to rely on Investment Areas in its certification application,[14] and instead submitted that it satisfied the Target Market requirement by virtue of serving LITP individuals.[15]

On December 22, 2005, OnPath submitted its certification application to the CDFI Fund.[16]  OnPath indicated that it served LITP individuals[17] in three areas of Louisiana: (i) the Metairie-Kenner-New Orleans metropolitan statistical area ("MSA"), (ii) the Houma-Bayou Cane-Thibodaux MSA, and (iii) non-metropolitan areas of Louisiana.[18]  OnPath identified these three areas as comprising its Target Market, and indicated that it directed a sufficient amount of financial products and services to LITP individuals in these areas.  OnPath submitted figures demonstrating that it met the 60% threshold as to each of six distinct metrics related to membership and financial activities.  The table below summarizes OnPath's Target Market

---

[13]   *Id.*

[14]   R. Doc. 19-4 at 19 (OnPath's Application for CDFI Certification) ("Does the Applicant serve an Investment Area(s)?" . . . "No").

[15]   *Id.* ("Does the Applicant serve a Low-Income Targeted Population(s)? Yes.").

[16]   *Id.* at 4.

[17]   *Id.* at 19.

[18]   *See id.* at 32-33.

contributions by area, as submitted in its certification application.  All data correspond to FY 2004.[19]

| Metric | Percentage corresponding to LITP in the area | | |
|---|---|---|---|
| | Metairie-Kenner-New Orleans MSA | Houma-Bayou Cane-Thibodaux MSA | Non-Metro Areas |
| Number of loans | 79% | 74% | 69% |
| Loan balances | 64% | 63% | 61% |
| Number of deposit accounts | 78% | 66% | 60% |
| Deposit account balances | 63% | 64% | 62% |
| Number of members | 83% | 73% | 65% |
| Number of member accounts | 80% | 64% | 61% |

OnPath also explained in its application how it determined whether a member satisfied the LITP criteria, and, in turn, how it calculated the above percentages so as to meet the Target Market requirement.  Specifically, OnPath wrote that it

> verified distribution of financial products and services to the designated target market by running [Marketing Customer Information File ("MCIF")] reports based on members' zip codes.  Through this process, [it was] able to determine how many households, members, accounts, loans and loan dollars,

---

[19]     *Id.*

deposits and deposit dollars, . . . fell within each designated Low Income Targeted Population.[20]

The third-party MCIF data contained member income levels, allowing OnPath to match financial activity with income, and classify certain members and transactions as corresponding to LITP individuals in each geographic area.[21]

On January 24, 2006, OnPath received CDFI certification.[22]   It received technical and financial assistance awards from the CDFI Fund for FYs 2006, 2007, 2008, and 2009,[23] and had its CDFI certification extended on March 20, 2009.[24]   Following this extension, OnPath again received technical and financial assistance awards for FYs 2011 and 2012.[25]  The CDFI Fund recertified OnPath in 2013, but the FY 2013 certification application and the CDFI awards postdating 2012 are not at issue in this litigation.

On October 6, 2014, the Treasury Office of Inspector General (the "OIG") began an audit of OnPath's CDFI applications and awards.[26]   The

---

[20]   *Id.* at 20.

[21]   *Id.* at 149 (OIG Audit Report).

[22]   *Id.* at 131 (OnPath's CDFI Certification) (Jan. 24, 2006).

[23]   *See id.* at 146 (OIG Audit Report).

[24]   *Id.* at 133 (Notice of Extension of CDFI Certification Expiration Date) (Mar. 20, 2009).

[25]   *Id.* at 146 (OIG Audit Report).  OnPath did not receive an award for FY 2010.  *Id.*

[26]   R. Doc. 34-8 (OIG Engagement Memorandum) (Oct. 6, 2014).

audit "was initiated based on information the OIG received regarding allegations that [OnPath] had not engaged in eligible activities" as required by the CDFI Program.[27]  Over the course of the ensuing five years, the OIG, the CDFI Fund, and OnPath engaged in discussions regarding the information submitted by OnPath in its applications for CDFI certification and CDFI awards, as well as OnPath's receipt and use of CDFI funds.  The investigation included meetings between the OIG and OnPath, both by teleconference,[28] and in person at OnPath's headquarters in Harahan, Louisiana;[29] internal meetings between the OIG and the CDFI Fund;[30] written explanations by OnPath of the methodology underlying its 2005 certification application;[31] and substantive email correspondence among the parties.[32]  As part of the audit, OnPath was given an opportunity to review

---

[27]   R. Doc. 19-4 at 177 (CDFI Repayment Demand Letter to OnPath).

[28]   R. Doc. 34-14 at 40 (OIG Follow-Up Interview Write-Up) (Mar. 29, 2017); *id.* at 50 (Exit Interview Write-Up) (June 25, 2018).

[29]   *Id.* at 8 (Entrance Conference Minutes) (Apr. 6, 2015).

[30]   *Id.* at 17 (Working Meeting Interview Write-Up) (Apr. 23, 2015); *id.* at 23 (Interview Write-Up) (Nov. 5, 2015); *id.* at 46 (Interview Write-Up) (Apr. 26, 2017).

[31]   *Id.* at 28 (OnPath's 2006 Validation Methodology) (Mar. 27, 2017).

[32]   *See* R. Doc. 34-7 (Emails between Sonya Jarvis and OIG) (Mar. 17, 2017); R. Doc. 34-9 (Emails between Sonya Jarvis and OIG) (May 21, 2018).

and comment on drafts of the OIG's audit report, both through management[33] and through counsel.[34]

On July 11, 2019, the OIG issued a final audit report on its findings.[35] It concluded that "the CDFI Fund certified [OnPath] . . . in January 2006 based on invalid information" in OnPath's original application for CDFI certification.[36]  The OIG applied the methodology purportedly supporting OnPath's 2005 certification application, and identified three specific problems.  First, the OIG found that OnPath's geographic categorization of its members and financial products was unsupportable.[37]  For instance, OnPath submitted in its application that it had 157,381 member accounts in the non-metro portions of Louisiana,[38] but OIG's analysis of OnPath's records revealed that it only had 5,380 such accounts.[39]  The OIG found that this and other discrepancies owed largely to the fact that OnPath improperly categorized 67 ZIP codes in the New Orleans-Metairie-Kenner MSA as falling

---

[33]     R. Doc. 34-9 at 1-3 (Emails between Sonya Jarvis and OIG) (May 10-21, 2018).

[34]     R. Doc. 19-4 at 168-71 (Letter from Phil Buffington, Jr. to OIG) (Dec. 19, 2018).

[35]     *See id.* at 135-176 (OIG Audit Report).

[36]     *Id.* at 140.

[37]     *Id.* at 150-152.

[38]     *Id.* at 33 (OnPath's Application for CDFI Certification).

[39]     *Id.* at 151 (OIG Audit Report).

into the non-metro area.[40]   The OIG explained that this improper categorization impacted the calculation of the LITP percentages, "[b]ecause low income thresholds vary depending on the geographic location of a member."[41]  Accordingly, "the geographic location has to be accurate."[42]

Second, the OIG found that OnPath improperly categorized certain members and their associated products as low income.  The OIG "identified 22,863 of 78,229 members (approximately 30 percent) with deposit accounts and 4,801 of 23,832 members (approximately 20 percent) with loan accounts . . . [who] *lacked income classifications*" in the third-party MCIF data that OnPath relied on for its member-income information.[43]  OnPath classified all of these individuals, who had unknown incomes, as low-income.  OnPath told the OIG that

> [OnPath's] former management assumed these members were low income because MCIF income information was collected using public records that must be verified three times by the third party to populate income classifications.  The absence of income classifications indicated that members tried to access credit less than three times in their lifetime.[44]

---

[40]     *Id.* at 152.

[41]     *Id.*

[42]     *Id.*

[43]     *Id.* at 153 (emphasis added).

[44]     *Id.*

OnPath assumed that those members' thin credit file meant that all of those members were low-income. But the OIG found that this assumption was not supported and not disclosed to the CDFI Fund in OnPath's certification application. As to the substance of the assumption, in October of 2005, OnPath asked the MCIF vendor whether the assumption was supportable. The vendor responded that it was not, because income data could be missing for a variety of reasons, and not just because the individual may be low income.[45] The OIG found that OnPath's assumption was "unreasonable,"[46] and its nondisclosure "significant."[47]

Third, the OIG found that OnPath manually adjusted the income of certain members to place them below the LITP threshold. Specifically, OnPath compared MCIF income data with its internal income data, and, if a member had an MCIF income *above* the LITP threshold, and an internally recorded income *below* the LITP threshold, OnPath relied on the lower value and categorized the member as low-income.[48] OnPath estimated that its former management manually lowered the income classifications of

---

[45]   *Id.*

[46]   *Id.*

[47]   *Id.* at 154.

[48]   *Id.* at 153-154; R. Doc. 34-14 at 31-32 (OnPath's 2006 Validation Methodology) (Mar. 27, 2017).

approximately 35% of members with incomes above the 2005 LITP cutoff.[49] And members were only adjusted downward; no members were adjusted upward, to above the LITP threshold. OnPath was unable to explain why the adjustments occurred in only one direction. The OIG further found that OnPath did not disclose this methodology to the CDFI Fund in its certification application.[50]

Based on these findings, the OIG recommended that the Director of the CDFI Fund "determine whether [OnPath] was in default of its . . . Assistance Agreements as a result of submitting invalid information in its Certification Application and Assistance Agreements."[51] It further recommended that the CDFI Fund "take appropriate action which may include requiring [OnPath] to reimburse the CDFI Fund" for certain awards received.[52]

On November 13, 2019, the Program Manager of the CDFI Fund notified OnPath that, based on the OIG's audit, the CDFI Fund had "determined that, as a result of [OnPath] submitting invalid information in its 2006 Certification Application, the FYs 2006 through 2009, 2011 and 2012 awards made to [OnPath] constitute improper payments in accordance

---

[49]   R. Doc. 19-4 at 154 (OIG Audit Report).

[50]   *Id.*

[51]   *Id.* at 160.

[52]   *Id.*

with the Improper Payments Elimination and Recovery Improvement Act of 2012 (31 U.S.C. [§] 3321)."[53]   It therefore "terminate[d] the Assistance Agreements" for those years' awards, and "require[d] [OnPath] to repay the CDFI Fund for the aforementioned awards, which total[] $12,298,806."[54]

On May 4, 2020, OnPath filed suit against the CDFI Fund, seeking this Court's review under the Administrative Procedure Act ("APA").[55]   OnPath seeks a declaratory judgment that the CDFI Fund wrongfully terminated the Assistance Agreements, and that OnPath is entitled to the awards that the Fund now demands to be repaid.[56]

On May 26, 2021, the CDFI Fund filed a motion for summary judgment, contending that its repayment demand was not arbitrary and capricious based on the administrative record.[57] On August 11, 2021, OnPath filed a cross-motion for summary judgment, asserting the opposite.[58] Specifically, OnPath contends that the CDFI Fund's repayment demand was arbitrary and capricious because: (i) the CDFI Fund relied on the OIG's erroneous comparison of data from mid-year 2005 with data from year-end

---

[53]     *Id.* at 178 (CDFI Repayment Demand Letter to OnPath) (Nov. 13, 2019).
[54]     *Id.*
[55]     R. Doc. 1 ¶ 3.
[56]     *Id.* ¶ 92.
[57]     R. Doc. 19.
[58]     R. Doc. 52.

2004;[59] (ii) OnPath was actually eligible for CDFI certification,[60] but the OIG and the CDFI Fund failed to assess OnPath's actual eligibility, and instead attempted to replicate the faulty methodology underlying OnPath's original application;[61] and (iii) both the OIG and the CDFI Fund failed to account for significant errors made by the CDFI Fund during the review and approval of OnPath's applications for certification and assistance.[62]

The Court considers the parties' arguments below.

## II.   LEGAL STANDARD

Under the APA, the Court must "hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."   5 U.S.C. § 706(2).   The reviewing court will find an agency action arbitrary or capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed

---

[59]   R. Doc. 52-3 at 16-17.

[60]   *Id.* at 23-24.

[61]   *Id.* at 17-21.

[62]   *Id.* at 21-23.

to a difference in view or the product of agency expertise." *La. Env't Action Network v. E.P.A.*, 382 F.3d 575, 582 (5th Cir. 2004) (quoting *Tex. Oil & Gas Ass'n v. E.P.A.*, 161 F.3d 923, 934 (5th Cir. 1998)).  The Fifth Circuit has explained that, "under this deferential standard, a court reviewing an agency action may not substitute its own judgment for that of the agency." *Id.*  This is because agencies "have expertise and experience . . . that no court can properly ignore." *Univ. of Tex. M.D. Anderson Cancer Ctr. v. United States Dep't of Health & Hum. Servs.*, 985 F.3d 472, 475 (5th Cir. 2021) (quoting *Judulang v. Holder*, 565 U.S. 42, 53 (2011)).

An agency passes muster under the arbitrary-and-capricious standard if it "has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Sierra Club v. Glickman*, 67 F.3d 90, 97 (5th Cir. 1995).  The scope of the reviewing court's inquiry is limited to "determining if the agency's judgment conforms to minimum standards of rationality." *La. Env't Action Network*, 382 F.3d at 582.

The court's review is limited to an examination of the administrative record before it.  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

## III.  DISCUSSION

The Court finds that the CDFI Fund's decision to demand repayment of OnPath's awards, based on the findings of the OIG's audit, was not arbitrary and capricious.  As detailed above, the OIG conducted a thorough, years-long investigation into OnPath's certification application, among other issues.  The OIG communicated extensively with both the CDFI Fund and OnPath throughout the process.  OnPath had numerous opportunities to answer the OIG's questions, to respond to its concerns, to explain and support the information submitted in the 2005 application, and to contest the intermediate findings of the OIG, including by reviewing multiple draft audit reports.   OnPath submitted detailed descriptions of its 2005 methodology, both in writing and through verbal communications.  The OIG analyzed and replicated this methodology as a core part of its audit.  The record makes clear that the OIG attempted to understand certain unexplained and troubling aspects of OnPath's methodology, and, as a result of the investigation, found that OnPath's original application for CDFI certification in 2005 was deficient in multiple ways.   Based on those problems, the OIG recommended that the CDFI Fund decide whether to seek recoupment of the awards received pursuant to that certification.  The CDFI

Fund decided to do so.  The administrative record contains ample support for that decision.

And while OnPath disagrees with the CDFI Fund's decision, this Court's review is limited to the APA's deferential arbitrary-and-capricious standard.  The CDFI Fund's decision quite easily withstands that scrutiny. The essential fact pattern here is that a federal-funding applicant submitted invalid information in its application, received funds based on the application's approval, and, upon discovery of the problems with the application, has been instructed to repay those funds.  Based on the record before the CDFI Fund, this Court cannot find that the agency's judgment fails to "conform[] with minimum standards of rationality."  *La. Env't Action Network*, 382 F.3d at 582.  Nor can the Court find that the agency has failed to "articulate[] a rational connection between the facts found and the choice made." *Sierra Club*, 67 F.3d at 97.  Indeed, the CDFI Fund's explanation for the repayment demand is completely consistent with the OIG's findings and the record evidence supporting those findings.  The explanation for the decision is neither "implausible," nor "counter to the evidence" in the record. *La. Env't Action Network*, 382 F.3d at 582.  Tellingly, OnPath does not cite any case in which a court set aside an agency's decision to demand repayment following an audit—much less an audit of this length and magnitude.

17

Because the CDFI Fund "has considered the relevant factors and articulated a rational connection between the facts found and the choice made," *Sierra Club*, 67 F.3d at 97, the Court finds that its decision to seek recoupment of funds received by OnPath for FYs 2006-2009, 2011, and 2012 is not arbitrary and capricious under the APA.  *See* 5 U.S.C. § 706(2).

## A.    Comparison of 2004 Data with 2005 Data

OnPath's arguments to the contrary are without merit.  OnPath first contends that the OIG erroneously compared two distinct sets of loan data.[63] Specifically, OnPath's certification application was based on loan data as of the end of FY 2004, but the OIG conducted its audit using loan data from mid-year 2005.[64]   OnPath asserts that this mismatch "leaves the OIG's central finding upon which the CDFI . . . based its decision . . . without any supporting evidence."[65]

This argument is unconvincing for multiple reasons.  First, OnPath gives the Court no reason to believe that the two datasets—separated by a period of approximately six months—differ meaningfully from one another.

---

[63]    R. Doc. 52-3 at 16-17.

[64]    R. Doc. 34-14 at 29 ("It should be noted that this data file is from July of 2005.  The original . . . CDFI application was completed using data as of December 31, 2004.").

[65]    R. Doc. 52-3 at 17.

And even if there were moderate changes in OnPath's membership or financial activities during that period, it strains reason to suggest that six months' time would account for percentage discrepancies on the order of one-thousand to two-thousand percent.[66]

Second, the record indicates that the reason the OIG used mid-year 2005 data for its analysis is because OnPath could not locate its year-end 2004 data.  For instance, on May 21, 2018, OnPath's CEO stated in an email to the OIG that the year-end 2004 data "is no longer available," and "inaccessible," and that "July 2005 data would have to be used as a proxy."[67] Similarly, in a letter from OnPath's counsel on December 19, 2018, OnPath conceded its "inability to find the underlying data used in completing the applications for CDFI."[68]  OnPath does not assert that it provided the year-end 2004 data to the OIG or the CDFI Fund at any point during the five-year audit.

Finally, even if this objection held any water, it would tend to undermine only *one* out of the *three* problems that the OIG identified in

---

[66]  *See* R. Doc. 19-4 at 151 (OIG Audit Report) (indicating, *inter alia*, a difference of 2,825% in reported number of member accounts in non-metro portions of Louisiana).

[67]  R. Doc. 34-9 at 1 (Email from Sonya Jarvis to OIG) (May 21, 2018).

[68]  R. Doc. 19-4 at 169 (Letter from Phil Buffington to OIG) (Dec. 19, 2018).

OnPath's certification application.  Specifically, while it would compromise the OIG's conclusions derived from its comparison of the geographic information in OnPath's application (the 2004 data) with internal data reviewed during the audit (the 2005 data), it would *not* affect the OIG's other two conclusions, regarding OnPath's unreasonable classification of certain individuals as low-income.  The income-classification concerns emanate exclusively from OnPath's summary of its 2005 methodology, and other items in the administrative record.  These two problems, as identified and described by the OIG, do not facially turn on any comparison of the 2004 and 2005 datasets.

For all of these reasons, the OIG's comparison of data from mid-year 2005 with data from year-end 2004 does not render the CDFI Fund's decision to seek repayment of funds arbitrary and capricious.

## B.     Failure to Independently Test OnPath's Eligibility

OnPath dedicates much of its briefing to the contention that, as part of the audit, the OIG should have "objectively test[ed]" whether OnPath was "in fact eligible" for CDFI certification.[69]  According to OnPath, the OIG and the CDFI Fund improperly limited their inquiry to "the specific data submitted

---

[69]     R. Doc. 52-3 at 17-18.

in the 2005 Certification Application," and thereby "shifted the audit exercise from an objective test of CDFI eligibility to a subjective test of 'validity.'"[70]

But despite all its protestation around this issue, OnPath has not provided any reason—whether rooted in statute, regulations, or even general principles of fairness—why the OIG's audit required an inquiry into, and independent determination of, OnPath's actual eligibility. And the Court does not find any reason to impose such a requirement. By way of analogy, an employer who finds that its employee submitted invalid information in his job application may fairly terminate the employee without determining whether he was "in fact" qualified for the job. So too may a federal fund demand repayment from a fund recipient based on an invalid application, without testing the applicant's "in fact" eligibility.

And critically, in asserting that it was in fact eligible for CDFI certification, OnPath does not rely on the information or methods actually used in its certification application. Instead, OnPath contends that it is by virtue of "Investment Areas"—the *other* route to satisfy the Target Market criterion—that it was in fact CDFI-eligible.[71]   OnPath claims that "[a]n

---

[70]    *Id.* at 18.
[71]    *Id.* at 23-24.

analysis of all loans issued by OnPath in FY2004 shows that OnPath would have fully met the Target Market requirement based solely on qualified Investment Areas in Louisiana without necessitating any income-based analysis."[72]  But the fact is that OnPath used an "income-based analysis" in its certification application.  The OIG spent years attempting to validate that analysis—using OnPath's data and the methodology that OnPath described—and found the application deficient in multiple ways.  Whether an application using Investment Areas would have been similarly deficient is unknowable.  To attempt an "objective test" of OnPath's eligibility using Investment Areas would be to conduct a hypothetical inquiry into a hypothetical certification application that OnPath *did not submit*.  The OIG and CDFI Fund acted reasonably in refraining from such an exercise.

Accordingly, the decision not to conduct an independent investigation into OnPath's actual eligibility for CDFI certification, without reference to the application that OnPath actually submitted, does not render the CDFI Fund's repayment demand arbitrary and capricious.

---

[72]    *Id.*

### C.     Failure to Account for the CDFI Fund's Mistakes

OnPath further argues that the OIG and the CDFI Fund failed to account for the CDFI Fund's own errors in the application and certification process.   OnPath points to a series of asserted missteps and mistakes, including "mistaken guidance on target market selection, misinterpretation of mapping requirements, misunderstanding of credit union charters, and miscalculation of target market activities."[73]

Issues like these could render the agency's action arbitrary and capricious, because the Court's APA review asks in part whether the agency "entirely failed to consider an important aspect of the problem."   *La. Env't Action Network v. E.P.A.*, 382 F.3d at 582.   But here, the issues cited by OnPath do not amount to "an important aspect of the problem."   *Id.*

OnPath's complaint centers on the CDFI Fund's ultimate certification of a Target Market that was smaller than what OnPath submitted, and excluded nearly one-third of OnPath's members.[74]   OnPath points to confusing communications in which the CDFI Fund asked "a series of questions about board accountability" to the geographic regions identified in OnPath's application, which suggested that "each map represented a distinct

---

[73]     *Id.* at 21.
[74]     *Id.* at 21-22.

Investment Area."[75]   The CDFI Fund also asked about member concentrations in certain areas, but ultimately excluded those areas from the Target Market that was certified.[76]

But while these communications may reflect an imperfect understanding of OnPath's application at the time, they do not amount to misguidance by the CDFI Fund or even "significant errors" bearing on the problems identified by the OIG.  As discussed above, two of the three issues that the OIG found with OnPath's application pertain exclusively to OnPath's means of classifying certain members as low-income.   None of the correspondence cited by OnPath touches on this issue.   Nowhere does OnPath explain to the CDFI Fund that, in its application, it (i) assumed that all members with unknown incomes were low-income, or that it (ii) moved 35% of its non-low-income members to the low-income category in calculating its LITP percentages.  Needless to say, the record contains no indication that the CDFI Fund encouraged, approved of, or acquiesced to this methodology.

---

[75]   *Id.* at 22; *see also* R. Doc. 34-4 at 3-36 (Emails between OnPath and the CDFI Fund) (Jan. 2006).

[76]   R. Doc. 52-3 at 22.

### D.    Other Issues

Finally, throughout its submissions, OnPath raises a series of miscellaneous issues and arguments, none of which alter the Court's conclusions.  For instance, OnPath contends that the OIG failed to consider certain norms and practices in the industry at the time of OnPath's 2005 certification application, as well as changes in the intervening period.[77]  But OnPath's unsupportable assumptions in its application are not remedied, or even explained, by the picture it paints of a young and underdeveloped industry in 2005.  For example, the general fact that "there [was] not one acceptable methodology" for meeting the CDFI Fund's Target Market criterion does not justify OnPath's unreasonable maneuvers in categorizing its members as low-income.  Nor does the CDFI Fund's decision to measure loan activity based on loans issued, rather than outstanding loans, bear on OnPath's invalid LITP methodology in 2005.  In sum, none of OnPath's concerns about industry practice, changes in CDFI policy, or the youth of the industry, undermines the OIG's findings or makes the CDFI Fund's repayment demand arbitrary and capricious.

OnPath also protests that that the CDFI Fund did not conduct its own review and investigation apart from the OIG's audit.  OnPath writes that

---

[77]    *Id.* at 11-12.

"[t]he CDFI Fund's decision is based solely on the OIG's finding that OnPath submitted invalid information in its 2005 Certification Application," and that the "CDFI Fund accepted the OIG's finding at face value and made no attempt to investigate the issues raised in the Audit Report."[78]  The Court soundly rejects this suggestion.  Not only does OnPath provide no authority for the proposition that a federal agency housing an internal Office of Inspector General must conduct an independent review of the OIG's findings, but also, it is plain from this record that the CDFI Fund was intimately involved with the audit.  The Court's arbitrary-and-capricious review does not license it to make such a demand on the CDFI Fund.

Finally, OnPath contends that the OIG and the CDFI Fund did not take into account the special consideration and exceptions afforded to entities serving areas affected by Hurricane Katrina in 2005.[79]  OnPath points to a Notice of Funds Availability ("NOFA") in the Federal Register stating that, for FY 2006 applications, the CDFI Fund will suspend certain requirements for institutions affected by Hurricanes Katrina and Rita.  *See* Funding Opportunity Title: Revised Notice of Funds Availability (NOFA) Inviting Applications for the FY 2006 Funding Round and the FY 2007 Funding

---

[78]     *Id.* at 14.

[79]     *Id.* at 20-21.

26

Round of the Community Development Financial Institutions Program, 70 Fed. Reg. 75860, 75864 (Dec. 21, 2005).  But OnPath does not explain what these exceptions have to do with its 2005 application, or in what ways the CDFI Fund allegedly contravened the stated exceptions.  And the Court's review of the notice reveals no relevant provision that bears on the OIG's and CDFI Fund's actions in this case.  The NOFA is beside the point.

OnPath also cites the CDFI Fund's FY 2006 Policies and Procedures, which states that "the Fund will give special consideration to" any applicant that is located in or serves an area declared by FEMA to be a major disaster area as a result of Hurricanes Katrina or Rita.[80]  But again, OnPath fails to explain how the CDFI Fund acted inconsistently with this nebulous policy, much less how such a failure would make the CDFI Fund's decision in this case arbitrary and capricious.  The Court finds that OnPath's concerns regarding Hurricane Katrina are without merit.

In sum, none of the issues raised by OnPath, whether individually or collectively, render the CDFI Fund's decision to demand repayment of OnPath's CDFI awards arbitrary and capricious under § 706 of the APA.

---

[80]   R. Doc. 52-6 at 8 (CDFI Program FY2006 Policies and Procedures).

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS the CDFI Fund's motion for summary judgment, and DENIES OnPath's motion for summary judgment.  Plaintiff's complaint is hereby DISMISSED.

New Orleans, Louisiana, this ___28th___ day of January, 2022.

_Sarah Vance_

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE